We will hear argument next in No. 161021, Western Bean Joint Venture v. United States. Did you look at Stuyvesant? It's the only maintenance dredging contract I could look at which required dredging of any urgent material. This is a case that focuses on what is known in the dredging industry as maintenance dredging. I can't emphasize more strongly to the court how important that term is to the dredging industry and how important it is to this case. Because there are two types of dredging generally. Maintenance dredging, which means removing essentially sediments or materials from a channel that's been dredged before. It's done in every navigable waterway and harbor virtually in the United States to keep its authorized depth open. If it's a 50-foot channel, you have to keep dredging it to make sure it stays at 50, but it's maintenance material. Then you have new work dredging or sometimes called construction dredging. That's where you're dredging material that's virgin, that hasn't been dredged before. Many times it's the deepening of a channel. For example, the project to deepen New York Harbor is new work dredging and usually involves very hard material. This project was described as a maintenance dredging project. A dredging contractor approaching a project like this, of course, looks at the title of the project first and says, okay, it's a maintenance dredging project. What type of work is involved? What's the description of work? There's a description of work clause. It says you're to dredge sediments from the Miami River. Contaminated sediments from the Miami River. All right, that provides just a little bit more information. The next place a dredging contractor looks is to the character of materials clause. What types of materials are these sediments that are being described? In this case, the character of materials clause says that there's sand and silt and silty sand and gravel. That's the primary. Cobble is a big piece of gravel? Cobble is anything from three inches to 12 inches in size, your honor. That could be 12 inches? Yes, a cobble could be 12 inches. Yes, your honor. When you hit real soft limestone with a bucket and it disintegrates, it breaks up into cobbles? Yes, it very well may. Some 12 inches, some less? Yes, your honor. That was a theory as to why some of these cobbles were around there. They were beat up when the channel was made back in the 30s? In part, your honor, what happened was in the 1930s, the channel was to be dredged to a depth of minus 15 feet. But the surveys that were conducted years later showed that the contractor at that time didn't achieve that depth in all cases. You showed 30% of the channel. Pardon me? You showed 28% of the channel. That's right. There was material left above grade at a depth of 14 feet. You figured that was in-situ rock. That's right. You had in-situ rock that had been dredged before. Pardon me? Yes, you thought it was in-situ rock. That's right. Now, the problem is, though, that after you look at the Character Materials Clause, it does say there may be some cobbles and so forth, loose cobbles along the bottom. When you go beyond the Character Materials Clause to try to find out, well, where are these sediments? What's their composition? The best information is in the geotechnical information that's included with the solicitation and the contract. That's in the form of boring logs, the form of wash probes, and particularly a form of what are known as particle size distribution tests or gradation curves, where they take and test some of the material that comes out of the borings to determine its grain size. Critically, in this case, the profile of the bottom was sediment overlaying limestone. The sediments all were shown to be basically fine-grained materials, certainly not exceeding 1.5 inches in size. Easily dredgeable and easily processable. I must mention here that that's another critical distinction in this case from the typical dredging case. The 12-inch cobble would be easily processable? No, it would not, Your Honor. But you had to bring up the 12-inch cobble. Well, that's part of the issue. How do we know in this case how much of the rock you brought up that couldn't be swallowed or couldn't be processed were 12-inch cobbles that existed originally, as opposed to 12-inch cobbles that got busted off as a result of your dredging machine? Well, the contractor in removing the material separated materials, and there were stockpiles of rock. You're going along and you hit some of this loose stone, limestone, and you knock it, and it creates a 12-inch cobble. That 12-inch cobble is lying right next to one that's been there since 1930. You bring them up. How do you know which one's old and which one's new? Well, the contractor can keep track of what elevation he's dredging. We had a profile from the borings and the wash probes as to where this line was. You can't prove it, right? There's no way you can prove it. Well, we can prove how much material was below this sharp interface between the sediments and the limestone, because that profile was drawn and there was no disagreement between the parties as to where that was. The material that was above that line is a little bit more difficult, but the court below didn't even want to consider it, because the court below found that since you knew there was some rock, it's all. Your view is that the 15-foot dredging limit doesn't apply to two quality of stone. In situ stone, the stuff you couldn't dredge up, but it also doesn't apply to dredgeable stone. It doesn't apply because a maintenance contract never digs up virgin material. Yes, and it doesn't apply to material that is not sediment, as described in all of the clauses in this contract, which have to be read in harmony. Are those cobbles or sediment? Cobbles are not sediment, Your Honor. Then you have to bring up the old cobbles. We took the position that you did not. Yes, and you have to bring up the cobbles, the old cobbles. Well, the character materials clause warned the contractor that there may be some loose cobbles along the bottom. Did they just leave them there, the old ones? No, Weston Bean, to be safe, even though there was no information provided in the plans and specs to allow this number, said, we're going to assume there's 3% to 5% of oversized material. Not the 30% that it encountered, but 3% to 5%. So yes, Your Honor, they certainly allowed for some of that. It does not seem to me that the hinge that your argument turns on is that maintenance contracts never bring up virgin material. It's not that they never bring it up, Your Honor. Not required. Right. The question is, does it entitle you to additional compensation under either the constructive change theory or the differing site conditions theory? Well, it had to do with the contract in Stuyvesant Dredge that you cited that case for a different proposition. It was a maintenance contract, the only one I could find in our circuit of a maintenance contract, and it clearly required for the excavation of some virgin material. Yes, and I think that was laid out that way in that particular contract. That means it's quite possible that you can have a maintenance contract where you're going to have to dredge virgin material. If that is the plan going in, Your Honor, and it's rare that it happens, there would be dual funding. Because the Corps of Engineers is only permitted to use operation and maintenance funding for maintenance dredging, and they're not allowed to use that funding for new work dredging. They have to use construction general funding. This project was funded entirely by operation and maintenance. The other important thing is, Your Honor, that unlike a typical dredging case- They could get the money back from you because it was wrongly paid to you? No. You don't think they could? Get it back from us? No, because they didn't pay us, Your Honor, for the part that we're talking about here today. They could refuse to pay you on the grounds that it wasn't funded. Well, listen, if the Corps of Engineers did something internally that was improper, I would assume they'd have to answer to an inspector general or someone like that. That's something that we obviously don't have any-my client has no power to address. But the important thing is, Your Honor, that this material, unlike a typical dredging contract, had to be processed. If you're a viewer, the problem wasn't dredging. The problem was processing. That's right. You had no trouble digging the stuff up. That's right. And that's what made the proper description of the materials to my client so critical. And if you had-I suppose your argument would be if you'd only known earlier, you would have hired the right processing machine to start with, and you would have processed it all, and everybody would be happy. That's right, because the processing equipment that we had was quite capable of handling the sediments that were described in the specs as the material to be dredged. What the processing machine does, does it beat it all up into gravel, into sand? No, Your Honor. The material, after it's mechanically dredged from the river, it's placed in the barges and then is offloaded, and there's a separation. Old tires and things like that are taken out. And there are a series, essentially, of grizzlies or conveyor belts that separate the material into various sizes. It's a very large and interesting and complicated process. And, of course, these were to be contaminated sediments, so polymers were added, so that when you were to end up with something that was dry and that was contaminant-free, that could be taken to a disposal site. So given your take on the contract and given the government's take on the contract, why wasn't there a patent ambiguity up front? I mean, you look at the contract, and you said maintenance. There's 30 percent of that down there is going to be rock. We don't have to dredge it. We don't know whether it's real, in situ, undredgeable, but we don't have to dredge the dredgeable rock. And the government is saying, you've got to go to 15 feet, period. Your Honor. Why isn't there a patent ambiguity on this issue? Because my client sent a memo to the Corps of Engineers. It's found at pages, appendix 1186 to 1189. It was addressing this very issue, informing the Corps of Engineers, that we felt that there was going to be less sediment that actually would be removed under this contract than was... 1186 or 1386? Let me double check here. I'm sorry, 1386 to 1389. 1386, Your Honor. You're correct, Your Honor. And it was advised... You're asking me, if 30 percent was rock, you wouldn't have to dredge? Right. So we did give, to the extent that this part of it was apparent, we warned the Corps of Engineers before bidding that this is what we suspected. And the response was, well, unless you have different geotechnical information than we have, you just bid it as you see it, or bid it according to the specs. There was no way that our client, or I believe any reasonable dredging contractor, would have thought that in a maintenance dredging contract, where the materials are described as contaminated sediments, that materials below that sediment line, which were clearly virgin materials, would have to be dredged and disposed of. The more logical assumption would be, we either leave it, or if you really want us to remove it, you've now constructively changed this contract, and we want to be compensated for it. You didn't dredge down to the minus 15 foot. There was a requirement to dredge to minus 15 feet, Your Honor, but that's in materials that were described as sediments. And everything was described as either sediments or below this line, virgin material. If the material below that sharp interface line is not a sediment, then it's not maintenance material. And yes, you can be required to dredge down to that line, but it becomes a constructive change to the contract, because that's not the material that's maintenance material that was the purpose of this contract. And the interesting irony here is, we're dealing with a 15 section, acceptance section project. Our claim is for sections one through six. There was an 18-month delay for funding reasons when they resumed for seven to 15. Seven to 15, the Corps of Engineers decided to relax its position, because we didn't want to dredge down to minus 15. We continually asked for permission to stop as we hit harder stuff in one through six, and the Corps said, no, no, you take it down to minus 15, unless you can show us it's massive, monolithic, in situ rock. So we were constantly bringing up this material and having to process it. In seven to 15, the Corps of Engineers allowed the contractor, basically, to leave that material. But because they left that material, they had an underrunning quantity. So the contractor, under the Variation Estimated Quantities Clause, said to the Corps, we didn't get enough revenue because of this underrunning quantity. You should pay us some extra money. The Corps agreed and paid them an extra $4 million in areas seven through 15. The irony is that they were paid an extra $4 million to leave material that was not sediment, when in one through six, when they removed it, they were paid nothing, and that's what this claim is all about. You have used all of your time, including your... When you said got paid nothing, you got paid. You didn't get paid the extra cost associated with bringing it up. That's right. Right. You got paid for every pound or cubic foot of what you brought out. We got paid for cubic yardage of material under the contract, but not for the true cost of having to process it when it was either differing site condition material or constructive change material. Thank you, Your Honor. We will restore your rebuttal time. I'm sorry? You may have your rebuttal time back. Thank you very much, Your Honor. May it please the Court. The decision of the Court of Federal Claims should be affirmed because the trial court correctly determined that the contract documents required Weston Bean to dredge all material in the dredging template except for massive monolithic in situ rock. The court also correctly found that Weston Bean was not required to perform any work beyond the requirements of the contract. Further, the court correctly found that the conditions indicated in the contract documents did not differ materially from the conditions actually encountered and that the conditions that Weston Bean actually encountered were reasonably foreseeable. Weston Bean focuses on the title and description of work clause. But asks this court essentially to disregard the plain language of the character of materials to be dredged clause and other contract provisions. But as Weston Bean concedes, the contract must be read as a whole and in a manner that gives meaning to all of its provisions. The character of materials to be dredged clause is the only contract provision that describes the materials required to be dredged. In fact, the phrase to be dredged is required specifically to inform potential bidders that those are the types of materials that will be required to dredge. It's unclear whether Weston Bean believes it was only required to dredge sediments or also required to dredge limestone, gravel, and cobbles along portions of the channel bottom and side slopes. But in any event, the contract is very clear. It was required to dredge all materials other than massive monolithic in the template. And as the trial court correctly found... All materials is your characterization of the clause. Contract doesn't say dredge all materials. The contract says... Those words aren't in the contract. The phrase all materials is not in the contract. The contract clause, the character of materials to be dredged clause, lists five types of materials and states that only massive monolithic in situ rock is not required to be dredged but shall be accurately located and the location reported to the contracting officer. So all of the other types of materials listed are required to be dredged pursuant to the doctrine that the exclusion of one thing... It's the exclusion of one... Excuse me. The expression of one thing implies the exclusion of all others. In your view, it expressly calls for bringing up limestone, hard limestone rock? It expressly requires soft to moderately hard limestone rock to be dredged, yes, Your Honor. But massive monolithic in situ rock need not be dredged. Isn't that in the definition of sediment? Gravel is in the definition of sediment, Your Honor, as well as sand, silty sand, clay, and silt. So those are the materials that the court found are required to be dredged. When the materials... Character of materials clause refers to sediments overlying soft to moderately hard limestone rock, that means hard limestone rock is dredgeable, is in the dredgeable material. Yes, Your Honor, that is our interpretation of the contract, that soft to moderately hard limestone rock is dredgeable, and the court found that such rock was dredgeable. So that, again, the only type of material that was not required to be dredged of these five types was massive monolithic in situ rock. What do I make of the fact that the contracting agency lacked the fiscal authority to require the dredging of the moderately hard limestone rock? Westonbine provided no evidence that the agency lacked fiscal authority other than testimony of Westonbine's own witnesses, perhaps a government witness. Westonbine does not point to anything other than the authorization statute from 1986. It doesn't point to the appropriations acts that were the basis for the funding for this dredge. In addition, we've pointed to the dredge management materials plan, which indicated that during the 20-year period, there may be both construction and maintenance dredging. Again, Westonbine conceded today that it does not wish for the contract to be deemed illegal in any manner. So there simply is no evidence in terms of statutes or otherwise that's been presented by Westonbine, which has the burden that there was a lack of funding authority, and the court made no finding regarding whether this contract was fiscal. Are you aware of so-called maintenance dredging contracts other than the one in Stuyvesant dredging that clearly called for dredging of virgin material? I'm not aware of any, and I don't believe the court made any findings regarding other dredging contracts. The reason why I raise it is your adversary is making this argument in essence to say that there's just a binary difference between maintenance dredging and any other kind of dredging, and that maintenance dredging never requires dredging of virgin material. And I found Stuyvesant, which is au contraire, and I just wondered as a matter of practice whether there were other contracts that deemed themselves as maintenance contracts but nonetheless require dredging. I'm not aware of any other than the Stuyvesant case, Your Honor, and in any event, the court did find that it need not look to trade practice because there is no allegation that there is an ambiguity in the contract. And so absent an ambiguity, the court should not look to evidence of trade practice, including various definitions of maintenance dredging, to justify a departure from the contract's terms. The court also determined correctly that to the extent the term maintenance dredging appears to conflict with other contract provisions, such as the character of materials to be dredged clause, those provisions control over the more general term maintenance dredging so that the contract can be read as a whole and harmonious in giving meaning to all of its parts to require what's to mean to dredge all of the materials listed in the character of materials to be dredged clause other than massive monolithic in situ rock. And just so that I understand, when you referred a few minutes ago to the definition of sediment, you mean the implicit definition in that clause? It does not use the word definition, Your Honor, but I'm referring to the character of materials to be dredged clause, which stated that the materials to be dredged consisted of sediment, including, I believe the word was including, sand, silty sand, clay, silt, and gravel. And again, Your Honor, It starts by saying the sediments in the Miami River are a combination of sand, silty sand, clay, silt, and gravel, overlaying soft and moderately hard limestone. Yes, Your Honor, and the court found that those were two types of materials set forth in the character of materials to be dredged clause in that single sentence of sediments, in which the court found were defined as sand, silty sand, clay, silt, and gravel, and the underlying soft and moderately hard limestone rock. I think perhaps I'm confused about this, but if one read that first sentence as characterizing the sediments as the stuff on top of the soft to moderately hard limestone rock, would one still say that the dredging had to include the soft to moderately hard limestone rock, just because that was not considered, even though it would not be considered sediments? Yes, Your Honor, because the contract did not state that soft to moderately hard limestone rock, if encountered, is not required to be dredged. It did state that for massive monolithic sediment. Does it say somewhere else that something that does not constitute sediments has to be dredged? This is the character of materials to be dredged clause. This is the entire clause. This is the basis of your argument about what has to be dredged. There's no other sentence that says dredged to 15 feet, whether it's sediment or not sediment. No, in fact, Your Honor, there are several other clauses. There is the final examination of work clause, which stated that the government could require Weston Mead to remove any shoals, lumps, or other lack of contract depth. Continuity of work clause, stating that Weston Mead would not be paid until the full depth required under the contract was secured, unless prevented by ledge rock, which the court correctly interpreted as massive monolithic sediment rock. Ledge rock is equivalent to massive monolithic sediment rock. There are also the estimated quantities listed in the contract, which included in the estimated quantities all materials in the dredging template, not just sediment. There were the contract drawings that confirmed the requirement to dredge to minus 15 feet. These provisions taken together clearly require Weston Mead to dredge to the dimensions of the template down to minus 15 feet and within the drawing dimensions, the dimensions set forth in the drawing, other than massive monolithic in situ rock. To the extent Weston Mead was uncertain what the phrase massive monolithic in situ rock meant, it was required to ask for clarification from the government. And you think its request wasn't sufficient? Its request, Weston Mead provided testimony from its own witness. You didn't make a patent ambiguity argument below. You just made one a second ago. No, we're not arguing that there is a patent ambiguity. But to the extent there is an ambiguity, it was a patent ambiguity. We're not arguing that there's an ambiguity. We believe the contract can be read as a whole and interpreted in a manner to give meaning to all of its parts. And that contract required Weston Mead to dredge the entire dimensions of the chamber. If there were a patent ambiguity, would you agree with your adversary, the joint venture, by pointing out that 30% of the material and stuff they weren't going to dredge was sufficient to put you on notice? No, Your Honor. First of all, Weston Mead has not argued that there is a patent ambiguity. The possibility of a patent ambiguity contract came up in our argument today. Right, but they have not raised that argument before. They didn't raise it in the court below. I raised it. I mean, we're interpreting a contract, right? Yes, Your Honor. Okay. So it would be a bit aggressive, but it would not be illegal if we wanted to decide there was a patent ambiguity on this issue. It would not be illegal, Your Honor. And so all I was trying to get out of you was I raised it with your adversary. He very quickly responded and said, well, the answer to that, Your Honor, is we put him on notice. No, Your Honor. We disagree that they put the government on notice. First of all, the only indication was a single fact, which stated that we have determined that there is 30% rock. And they said we're not going to dredge it. And then Larry Bove at A107 came in and said the same thing. A107? That is testimony from Larry Bove. Well, I saw it. It's in the record. And there was no contrary testimony provided. Weston B. did not call any government witnesses to confirm the contents of this supposed conversation that occurred. And, again, it's Weston B.'s burden to indicate what discussions may or may not have taken place. In any event, there was no indication from Weston B. that it believed, not in the record, that it believed there was some kind of ambiguity. They said we're going to use a mechanical dredge, right? Because the dredge will only dig the refusal level. I'm just wondering. I mean, the adversary said if there was a patent ambiguity here, we put the government on notice. So that argument is weird. No, Your Honor. The notice, Weston B. alleges it provided, again, this is a new argument we've never heard before. There must be a different reason below. I'm the one who raised it. I know it's new. I'm sorry? You don't have to tell me it's new. I raised it. Yes, sir. So the argument, as I understand it, is that Weston B. now raises it. A little bit of a situation. A little bit of a situation. You say one guy says, you know, I don't have to take this rock up. And they tell the government I don't have to take it up. They put you on notice. It's just a simple point. The simple point is if you hypothesize a patent ambiguity, the contractor has a burden to come in before he bids to the government and say, hey, here's my problem. Here's the issue. And if they do that, then they're off the hook. Well, the burden, as stated in blue and gold, this court's decision in blue and gold, is that when a solicitation contains a patent ambiguity, the offeror has a duty to seek clarification from the government. And if failed to do so, precludes acceptance of his interpretation. There's no evidence that Weston B. came in and said, hey, we believe the title of this solicitation is maintenance dredging, yet we have identified some rock in the pay template. And because this is a maintenance dredging contract, we are not required to dredge it. Yet in the character materials to be dredged clause and the contract and the drawings, it looks like we're required to dredge to minus 15 feet. This appears to be an ambiguity. There was no such indication. Remind me, what was the response from the court to this? This is all about 1386. Is that what we're talking about? Yes, I believe so, Your Honor. And what was the court's response? Well, the court of engineer's response? There was no testimony given by any court of engineer's witnesses. Well, you mentioned something just a minute ago. You said something about what the court said, oh, go ahead. Well, that's testimony from Weston Bean's witnesses, where the response was to go ahead and bid to the requirements in the contract, so that Weston Bean was told, bid as if you're going to dredge all material in the template. Do not submit a bid that indicates that you are going to exclude 30% of the It's sort of newish today, but if one takes the blue and gold, you have to ask for clarification. What you just said about the court's response, which I think was describing what they said about the court's response, why is that not clarification, dig to 15 feet? Well, yes, that is clarification. So even if the court construes Weston Bean's inquiry to the court as sufficient under blue and gold, which it is not, the response from the government was bid 2 minus 15 feet. I suppose one could possibly argue that that response was itself ambiguous since there was a dispute about if the response was follow the contract and nobody had figured out what the contract meant, maybe that's not terribly clarifying. It may help to look at, again, this is one-sided testimony, but it may help again to look at the testimony from page 107 to see exactly how Weston Bean's witness characterized the response from the government. But as I recall, their response was something to the effect that, well, okay, in fact it is exactly at page 107. Which of the many pages? At the many page 255 beginning at line 17. Well, since you provided nothing materially different, please bid the specification. And that's the only testimony that was provided, again, by Weston Bean's own witness. The individual who's supposedly on the other end of the phone, Wanda Cruz, was not called. Judge Kaplan has findings about this, I think. I'm sorry? Doesn't Judge Kaplan has findings about this or even discusses it in her opinion, I think? That may be correct, Your Honor. It certainly is not something that the court ever found constituted notification. It wasn't a live issue. It was not a live issue. Again, because Weston Bean did not raise the argument that there was a patent ambiguity and that they requested clarification. I apologize if I've burned up too much of everybody's time with this, but it just struck me that somebody who's not very smart walks up to this case and reads the two briefs on this particular issue and you say, these people think that this is ambiguous. But neither party has argued that it's not. The neutral person listening to the argument says, well, there must be an ambiguity here if there's room for these two different theories. The government's position is that there is no ambiguity. The government's position is that the title has to be read in conjunction and it's a more general term.  Thank you, Your Honor. Yes, it is. It's a refusal. And after. Thank you, Your Honor. The judge on appendix page 17 did acknowledge that at the bottom of the next, the paragraph right before numeral four, Mr. Bowe further testified that after a few minutes of silence, Mrs. Cruz came back on the line and advised him that since you provided nothing materially different, please bid the specifications and the solicitation. It's a not unusual government answer to a question. Bid it as you see it. But the thing is, our client did tell the court how they saw it and that this was material that wasn't maintenance material. And as I said previously, what's interesting, in areas seven through 15, the court, in fact, did in practice carry out what we thought they should have done in areas one through six. In looking at what types of materials could you discern needed to be dredged based on this character materials clause, all the geotechnical information, which really is paramount here. You just don't learn anything from the character materials clause in and of itself. You have to look at the geotechnical information. We pointed out to the trial court below that the government estimator, looking at all the same information that's available to the bidders, classified all the material as mud. All of it. Even the limestone. So the government estimate was based on mud, and mud is sediment. So they couldn't have been further off from what had to be done on this project. If it had all been mud, processing would have been very, very easy. There also was some discussion about, well, wasn't this material dredgeable? You were able to dig it. The question isn't really whether it was dredgeable. We acknowledge that it was dredgeable, but because of the need to process it in a sediment processing plant, the question is, was that dredgeable material, in the case of below the sharp interface, a constructive change to the contract, because you should not have been required to remove it and certainly not to treat it in a maintenance dredging contract, and was the material above that sharp interface, to the extent that there were rocks and limestone and materials embedded in that sediment, something that none of the borings showed, was that not a differing site condition? Because there you had, indeed, a subsurface or latent physical condition that was materially different from what was indicated in the contract. What was indicated in the contract was sediments down to that line, and the particle size distribution test showed that none of those sediments exceeded 1.5 inches in size. The extent that you ran into three inch cobbles or boulders or whatever hard material was embedded in the sediment, that was a differing site condition. I think that's fundamentally what the court below didn't really grasp, is that we really had two different types of claims with regard to this condition. A constructive change below the sharp interface and a differing site condition above it. The court below simply took the view that, look, you were required to dredge to minus 15 feet. The character materials clause says that you're not required to dredge massive monolithic rock, so everything else has to be dredged. No, because if you come to that conclusion, you're reading the changes clause and the differing site conditions clause out of the contract. You're saying that putting aside massive monolithic rock, which we all agree doesn't need to be dredged, if there is anything else that's different from what's represented in the contract, we have to dredge it without compensation. That voids the differing site conditions clause. To the extent that it's a change, it voids the changes clause. And you certainly can't... But to the extent that what turned out to be the case was in the realm of what was not previously specified but was within the realm of the unspecified, as to which isn't the proper interpretation that that was a risk you took rather than a risk that the government took? We don't believe, Your Honor, except to the extent of a reasonable, very liberal allowance of 3% to 5% of oversized material that wasn't based on really any showing of geotechnical information. Beyond that, we didn't take the risk that the Corps of Engineers would engage in a practice that was a constructive change without compensation or that the Corps of Engineers would limit the differing site conditions clause. What the lower court's decision effectively said was, in this case, the differing site conditions clause only applies to one type of material in the universe, massive monolithic in situ rock. If you encounter any other type of material that's different or materially different from what's represented, we don't have to consider it because you were told to dredge to minus 15. That's just not the case. It's not the way dredging contracts are performed. You look at the geotechnical information, you look at the purpose of the project, and you proceed accordingly. I think your time has run out. Thank you very much, Your Honor. Thanks to both counsel and the cases submitted.